IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


SANDRA KELLOGG MORNEAU                                        PLAINTIFF

        v.                    Civil No. 12-4109

MARK D. SIMS; JACKIE RUNION;
JEFFREY CLAY RABORN; JUSTIN
SMITH; RON STOVALL; DUKE
SCHOFIELD; and ROBERT TIBBIT                                  DEFENDANTS


### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Sandra Kellogg Morneau (referred to as Plaintiff), has brought this action contending that Defendants violated her constitutional rights and those of her deceased husband Jean (John) Morneau (referred to as Morneau). Although Plaintiff was initially represented by counsel, she now proceeds *pro se* and *in forma pauperis.*

The tragic events that are the subject of this case started with a border dispute between Morneau and Separate Defendant Sims. Ultimately, an arrest warrant was issued for Morneau and during the course of the arrest Morneau was shot and killed. The case was initially filed in Louisiana and transferred to this Court after it was determined that the significant events, including Morneau's death, occurred in Arkansas. *See* Docs. 56-57.

The case is before me on four motions for summary judgment: (1) the motion of separate Defendants Sheriff Ron Stovall, Chief Deputy Duke Schofield, and Sergeant Robert Tibbit (Doc. 76); (2) the motion (Doc. 81) filed by separate Defendant Mark Sims; (3) the motion (Doc. 86) filed by separate Defendants Jackie Runion, Jeffrey Raborn, and Justin Smith; and (4) the motion

AO72A
(Rev. 8/82)

(Doc. 93) filed by the Plaintiff.  Despite the issuance of two show cause orders (Docs.  84 &89),

Plaintiff has not responded to any of the motions for summary judgment filed by the Defendants.

## 1.  Background

Mark Sims, a citizen of Louisiana, was a member of the Shang-Ri-La Hunting Club.[1] The

club leased property near Ida, Louisiana, which is in north Caddo Parish near the state line with

Arkansas.   The leased property was adjacent to land owned by Morneau.

For a period of several years, Morneau and club members were engaged in a dispute as

to the location of the Arkansas and Louisiana state lines.  *Doc. 81-3 Exhibit C.*  In fact, the

dispute between Morneau and various lease holders extended back as far as 2004.  *Id.*  Morneau

is alleged to have sought assistance from state and federal government officials to resolve the

location of the border "to avoid a violent confrontation as he presciently foretold." *Complaint*

at ¶ 19.

Lease holders complained to officials on a number of occasions.   *Doc. 81-3.*

Investigative reports show that Sims contacted an officer of the Arkansas Game & Fish

Commission in October 2009 to complain that Morneau had been trespassing on the club's deer

lease.  *Doc. 81-1; Doc. 81-3.*  He reported that Morneau, who lived within a couple hundred

yards of the state line, had positioned a deer blind directly on the border looking due north so that

the person using it would fire into Arkansas.  *Doc. 81-1.*  Sims reported that several club

members confronted Morneau the previous year.  *Id.*

Morneau, who was wearing two pistols, in a holster around his waist  (for which he was

well known), allegedly told them he would hunt where he pleased and he did not need a license.

---

1. The relevant facts were summarized in a report and recommendation entered on August 6, 2012 (Doc. 56).  The Court will draw from that summary as well as from the exhibits submitted in connection with the summary judgment motions.

*Doc. 81-1*.  Sims reported that he built a platform stand in the area for the current hunting season, but someone pushed it over and shot it full of large bullet holes.  *Id.*

Based on Sims' complaint, an Arkansas wildlife agent joined a Louisiana agent and went to Morneau's home to speak to him.  *Doc. 81-1*.  Morneau was wearing his twin pistols at the time.  *Id.*  According to the agent's report, Morneau denied doing any damage on the lease or making any statements to club members. *Id.*  The Arkansas agent wrote that he gave Morneau a printed map that showed the location of the state line.  *Id.*

Sims reported in January 2010 that the club members continued to have problems with Morneau, who was destroying stands and firing a gun into the woods when the members were in the area. *Doc. 81-1.*  An wildlife agent, accompanied by a Louisiana agent, visited Morneau. *Id.*  The agent wrote in his report that Morneau told the agents that he believed there was a "magnetic anomaly" in the area that made the lines drawn by surveyors incorrect.  *Id.*

Sims contacted the Game and Fish Commission again on September 27, 2010.  *Doc. 81-1.*  He reported that the problems were ongoing and that Morneau had cut several large trees, painted a line, and posted signs on land Sims leased.  *Id.*  Sims also reported vandalism to deer stands.  *Id.*

Sims again contacted an Arkansas wildlife agent on the evening of October 2, 2010. *Doc. 81-1.*  He reported that he had placed  a camouflage wooden blind worth several hundred dollars on his deer lease.  *Id.*  He said he soon saw Morneau use an ATV to drag the blind south towards Morneau's home. *Id.*

Sims completed an affidavit and warrant application in the District Court of Miller County.  *Doc. 81-2 Exhibit B*.  It was submitted in the name of Sims and James Wolfe, another member of the hunting club, but only Sims signed the sworn application. *Id.*  The Miller County

-3-

District Court issued a warrant dated October 8, 2010, to arrest Morneau for first-degree assault, harassment, and two charges of second-degree criminal mischief. *Id.*

On October 10th, Deputy Sheriff Tibbit, of the Miller County Sheriff's Department, was asked by Lieutenant Jackie Runion, of the Arkansas Game and Fish Commission, to accompany Arkansas wildlife agents Justin Smith, Jackie Runion, and Clay Raborn to assist with service of the arrest warrant. *Doc. 77-2.* This was Tibbit's first involvement with Morneau. *Id.*

Runion had advised the officers to wear full uniforms so that they could be immediately recognized as law enforcement officers. *Doc. 81-3.* The officers traveled to the deer lease to attempt to arrest Morneau on the Miller County warrant. *Doc. 77-2.* The officers had been told that Morneau was likely to come on the lease and destroy property on a Sunday afternoon. *See e.g., Doc. 81-3.* They state in their reports that they planned to wait for Morneau to cross into Arkansas, witness any destruction of property, and then identify themselves and arrest Morneau on the warrant. *See Doc. 77-2; Doc. 77-1.* The officers stated in the reports that they knew Morneau would be armed with at least two pistols, so they planned to take extra precautions. *See e.g., Doc. 81-3.*

All four officers took positions behind a raised berm that was once used as a railroad track. *See Doc. 77-1.* Morneau was observed kicking a cardboard blind that was down the trail. *See Doc. 81-3 Exhibit C.*

The reports state that when Morneau was about ninety yards north of what the officers believed was the state line, Tibbit stepped out into the open and announced himself as a police officer and ordered Morneau to raise his hands. *Doc. 77-2.* According to Tibbit, Morneau failed to raise his hands and immediately turned and began to draw his gun. *Doc. 77-2; Doc. 77-1.*

-4-

Tibbit saw Morneau raise his gun into firing position. *Doc. 77-2.* Tibbit shot once and Morneau was still standing with the pistol pointed at Runion. *Id.* Tibbit shot a second time. *Id.*

Runion states that Morneau had his left hand on a large revolver and was pulling it out of his holster. *Doc. 81-3.* Runion indicates Morneau cocked the gun and pointed it at the officers. *Id.*

Raborn and Smith stepped out of the woods south of Tibbit and began to yell that they were game wardens and for him not to move. *See Doc. 81-3.* Smith wrote in his report that as he and Raborn headed toward Tibbit and Morneau, he saw Morneau turn toward the officers, square up and begin to draw a pistol with his right hand, with his left hand on the other pistol. *Doc. 77-1.* Tibbit yelled, "Drop the gun! Drop the gun!" as Morneau continued to raise the pistol in his right hand and began to draw the other pistol from the left holster. *Id.* Raborn gave a similar account of the events and said he was going to fire at this point but heard two shots and saw Morneau fall. *Doc. 88-2.*

By affidavit the officers assert that no one was prevented from calling for assistance for Morneau or from being present with him. *Doc. 88-1.* Neither Plaintiff nor a priest were present. *Id.* Within seconds of the shooting, Runion indicates Smith was at Morneau's side assisting him and Raborn was calling for an ambulance. *Id.; Doc. 88-2.* Runion went to the trail head to assist medical personnel in reaching Morneau's side. *Doc. 88-1.* Morneau died before first responders arrived on the scene. *See e.g., Doc. 81-3.*

The day of the shooting, Special Agent Scott Clark of the Arkansas State Police conducted an investigation into the death of Morneau. *Doc. 77-1.* Clark arrived at the scene and observed Morneau's body lying on his back. *Id.* Clark observed the gun holsters and three guns--two Ruger .44 caliber single action revolvers; and one .380 caliber semi-automatic pistol. *Id.*

AO72A
(Rev. 8/82)

He also observed a "small collection of pocket knives." *Id.* Just west of the body, Clark saw a large cardboard box with camouflage style pain markings on it." *Id.*

A review of the evidence was completed by Carlton D. Jones, Prosecuting Attorney, Eighth Judicial District South. *Doc. 77-2.* It was concluded that Tibbit's conduct was reasonable and lawful. *Id.*

Sheriff Ron Stovall asserts that he "had no involvement whatsoever relative to the events surrounding the decedent." *Doc. 77-4.* In fact, he knew nothing about the incident until he was contacted after Morneau's death. *Id.*

Based on these events, Plaintiff maintains Morneau was deprived: (1) of his ability to seek legal counsel and the opportunity to challenge, or stay execution, of the warrants on legal grounds; (2) deprived of his right of life and liberty without due process; and (3) his right to equal protection of the laws.  All in violation of the First, Second, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the Constitutional and 42 U.S.C. §§ 1983, 1985, 1986, and 1988. *Complaint* at ¶ 24.

### 2.  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

-6-

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor."  *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."  *Id.* (*citing, Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3.  Discussion

As noted above, all Defendants have filed motions for summary judgment.  Plaintiff has additionally filed a motion for summary judgment.  However, her motion is merely a repetition of the facts as alleged in the complaint and is not supported by any affidavits or other evidentiary materials.

#### (A).  Claims under 42 U.S.C. § 1988

Plaintiff  purports to assert a claim under 42 U.S.C. § 1988.  Section 1988 does not provide for a separate cause of action.  *See e.g., Rose v. Kenyon College*, 211 F. Supp. 2d 931, 939 (S.D. Ohio 2002).  Section 1988 merely provides for the application of common law in civil rights proceedings brought under other statutes and for attorneys' fees and experts' fees in civil rights cases.  *Id.*

#### (B).  Claims under 42 U.S.C. §§ 1985 & 1986

The Plaintiff's factual allegations do not support claims based upon these statutes.  A claim under § 1985 is premised upon the existence of an alleged conspiracy which must be motivated by a class-based animus. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263,

-7-

268-69 (1993). Plaintiff has not alleged she or Morneau were members of a protected class[2] nor has she alleged that the alleged conspiracy was based upon a class-based animus. Finally, no claim exists under § 1986 as in order to be liable under § 1986 a Defendant must have neglected or refused to prevent a § 1985 conspiracy. *See Steele v. City of Bemidji*, 257 F.3d 902, 906 (8th Cir. 2001)(*citing Brandon v. Lotter*, 157 F. 3d 537, 539 (8th Cir. 1998)); *see also Gatlin v. Green*, 362 F.3d 1089, 1095 (8th Cir. 2004)(a § 1986 claim must be predicated upon a valid § 1985 claim).

### (C). Claims Against Sims

A Plaintiff may only bring a suit under 42 U.S.C. § 1983 against a person acting under color of state law to remedy constitutional violations or violations of certain rights created by federal statute. *See e.g., Carlson v. Roetzel & Andress*, 552 F.3d 648, 650 (8th Cir. 2008). "The under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Id.* (citation and internal quotation marks omitted).

"[A] private party's mere invocation of state legal procedures does not constitute state action." *Youngblood v. Hy-Vee Food Stores, Inc.*, 226 F.3d 851, 855 (8th Cir. 2001)(Store employee, who was not employed by the police department, was not a state actor when employee reported suspected shoplifting and detained the shoplifter until police arrived)(*citing Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 n. 21 (1982)).

Similarly, a private individual who complains of criminal conduct and is a witness for the prosecution does not act under color of law. *See e.g., Grow v. Fisher*, 523 F.2d 875, 879 (7th Cir. 1975)("The mere fact that the individual defendants were complainants and witnesses in an

---

[2] There is an allegation that Morneau was of Native American extraction. *Complaint* at ¶ 27. However, there is no indication and of the Defendants were aware of this.

action which itself was prosecuted under color of law does not make their complaining or testifying other than what it was, *i.e.,* the action of private persons not acting under color of law."); *Rodgers v. Lincoln Towing Service, Inc.*, 596 F. Supp. 13, 21 (N.D. Ill. 1984), *aff'd*, 771 F.2d 194 (7th Cir. 1985)(A private citizen does not act under color of law when reporting a crime).  It is clear Sims cannot be sued under § 1983 because he is a private citizen, not acting under color of state law.

### (D).  Claims Against Sheriff Stovall and Duke Schofield

"In the section 1983 context, supervisor liability is limited.  A supervisor cannot be held liable, on a theory of respondeat superior, for an employee's unconstitutional actions." *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995).  Instead, a supervisor is liable only if he directly participates in the violation or if his failure to train or supervise caused the violation.  *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001); *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997).  To be held liable for a failure to train or supervise, it must be shown that the supervisor had notice that the training procedures or supervision were inadequate and the inadequacy would likely cause a constitutional violation.  *Tlamka*, 244 F.3d at 635.  The complaint is wholly lacking in any allegations suggesting a basis for Sheriff Stovall or Schofield  to be held liable in their supervisory capacity.

An official capacity claim is considered a claim against the governmental entity.  *See Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998).  *See also Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).  Thus, an official capacity claim against Sheriff Stovall is a claim against Miller County.

A plaintiff may establish governmental liability under § 1983 by proving that his constitutional rights were violated by an "'action pursuant to official [governmental] policy' or

AO72A
(Rev. 8/82)

misconduct so pervasive among non-policymaking employees of the [governmental entity] 'as to constitute a "custom or usage" with the force of law.'" *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998)(*quoting Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978)). *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under § 1983."); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-79 (1986)(interpreting Congress' intent to limit § 1983 liability to situations that municipalities could control, without obligating municipalities to control the conduct of others). Here, Plaintiff has not alleged the existence of a custom or policy that was the moving force behind the constitutional violations she has alleged occurred.

### (E).  First Amendment Claims

Plaintiff alleges she was misled about the condition of her husband and that Defendants blocked her from going to her husband. *Complaint* at ¶ 43.  She further alleges that these actions restricted the free exercise of her rights to assemble with her husband, to speak freely with him, and also prevented a Catholic priest from attending to Morneau's religious beliefs. *Id.*

The summary judgment record contains the sworn affidavits of the wildlife agents that neither Plaintiff nor a priest was prevented from assembling with or caring for Morneau. Morneau died within a few minutes of being shot and prior to any medical personnel arriving. No First Amendment claim is stated.

### (F).  Equal Protection Claims

The Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV. "The Equal Protection Clause safeguards not merely against such invidious classifications as race, gender and religion,

but any arbitrary classification of person for unfavorable governmental treatment." *Hayden v. Grayson*, 134 F.3d 449, 453 (1st Cir. 1998).

"The Equal Protection Clause requires the government to treat similarly situated persons similarly, and dissimilar treatment of those not similarly situated does not result in an equal protection violation." *Ricketts v. City of Columbia, Missouri*, 36 F.3d 775, 781 n. 2 (8th Cir. 1994). "It is this comparative element that distinguishes the Equal Protection Clause from the Due Process Clause." *Jennings v. City of Stillwater*, 383 F.3d 1199, 1213 (10th Cir. 2004).

Here, there is no showing that Morneau was similarly situated with any other individual who was treated differently. No evidence has been presented of similar reports of criminal activity that were investigated differently.

Nor are there any genuine issues of material fact as to whether Tibbit or the wildlife agents engaged in unlawful or purposeful discrimination. "[T]he key requirement [in establishing an equal protection violation] is that plaintiff allege and prove unlawful, purposeful discrimination." *Batra v. Bd. of Regents of the Univ. of Nebraska*, 79 F.3d 717, 722 (8th Cir. 1996). Plaintiff has presented no evidence of animosity or ill will on the part of the Defendants based on the fact that Morneau is alleged to have been "of Native American extraction." *Complaint* at ¶ 26.

Nor is there any evidence suggesting the existence of a policy or custom of investigating crimes reported by Morneau and others Native Americans any differently than crimes reported by other individuals. In *Ricketts v. City of Columbia, Missouri*, 36 F.3d 775, 779 (8th Cir. 1994) the Court of Appeals for the Eighth Circuit was presented with the question of whether a municipality discriminated against women by failing to treat complaints of domestic abuse as seriously as complaints of nondomestic abuse. *Id.* The court held that to "survive summary

-11-

judgment, a plaintiff must proffer sufficient evidence that would allow a reasonable jury to infer that it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence, that discrimination against women was a motivating factor, and that the plaintiff was injured by the policy or custom." *Id.* (citation omitted).  A similar showing must be made by Plaintiff; that is, she must show crimes reported by Native Americans are investigated less thoroughly or somehow treated differently than crimes reported by other citizens.  No such evidence exists in the record before the court.

### (G). Due Process

Plaintiff alleges that Morneau did not have an opportunity to contest the issuance of the warrant for his arrest.  In *Baker v. McCollan*, 443 U.S. 137 (1979), the Supreme Court stated:

> The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted-indeed, for every suspect released. Nor are the manifold procedural protections afforded criminal defendants under the Bill of Rights "without limits." *Patterson v. New York*, 432 U.S. 197, 208, 97 S.Ct. 2319, 2326, 53 L.Ed.2d 281 (1977). "Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person." *Ibid.*

> The Fourteenth Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished "without due process of law." A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers-all of whom may be potential defendants in a § 1983 action-is entirely consistent with "due process of law." Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim. The ultimate determination of such claims of innocence is placed in the hands of the judge and the jury

-12-

*Baker*, 443 U.S. at 145-46. Here, Plaintiff does not deny that the warrant for Morneau's arrest was properly issued based on a finding of probable cause. Instead, Plaintiff merely disputes the property rights of Sims and the manner in which the arrest warrant was served.

### (H). Excessive Force During Arrest

"All claims that law enforcement officers have used excessive force in the course of an arrest or investigatory stop of a free citizen should be analyzed under the reasonableness standard of the Fourth Amendment." *Winters v. Adams*, 254 F.3d 758, 764 (8th Cir. 2001)(citation omitted); *see also Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989)(internal quotations omitted). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.*

"Objective reasonableness depends on the facts and circumstances of the case, the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." *Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009)(internal quotations and citations omitted). This inquiry is made "without regard to [the officers'] underlying intent or motivation." *Nance v. Sammis*, 586 F.3d 604, 609-10 (8th Cir. 2009).

-13-

After carefully considering the summary judgment record, I believe there is no genuine issue of material fact as to whether Tibbit acted reasonably under the facts and circumstances known to him.  The affidavits of Tibbit and of the other officers all indicate that Tibbit announced himself as an officer, told Morneau to raise his hands, and drop his guns.  Just moments later, the other officers identified themselves.  Despite this, Morneau drew one of his weapons and pointed it at the officers.  Morneau also had his hand on his second weapon.  While the outcome is tragic, Tibbit and the other officers acted reasonably under the circumstances. *See e.g., Roberts v. City of Omaha*, 723 F.3d 966 (8th Cir. 2013)("Fourth Amendment prohibits officers from using deadly force to make an arrest unless that individual poses a threat of serious physical harm")(internal quotation marks and citation omitted).

### (I).  Second Amendment

Plaintiff purports to assert a Second Amendment claim based apparently on Morneau's right to carry his weapons.  The claim is meritless.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Morneau was not prohibited from exercising his Second Amendment rights.  He in fact was armed. But he has no Second Amendment right to resist a lawful arrest or to threaten to kill law enforcement officers.

### (J).  Fifth Amendment Claim

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  Under *Miranda v. Arizona*, 384 U.S.

-14-

436, 467 (1966), prior to questioning an individual being held the police, they must warn the suspect that the State intends to use any statements made against him.  In this case, Morneau was not taken into custody and no statements were being used against him.  No Fifth Amendment claim exists.

**(K).  Sixth Amendment Claim**

"[T]he Sixth Amendment right to counsel attaches when the State initiates an adversary judicial proceeding 'by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *Beck v. Bowersox*, 362 F.3d 1095, 1101 (8th Cir.2004)(*quoting Kirby v. Illinois*, 406 U.S. 682, 689(1972) (plurality opinion)).  The right does not attach merely because an arrest warrant had been issued.  *Id.*

Here, the Sixth Amendment right to counsel had not attached.  Defendants were merely seeking to arrest Morneau on the warrant.

**(L).  Medical Care**

In this circuit, all denial of medical care claims are analyzed under the Eighth Amendment's deliberate indifference standard.  *Christian v. Wagner*, 623 F.3d 608, 613 (8th Cir. 2010).  "Deliberate indifference to serious medical needs . . . constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir.2009) (*quoting Estelle v. Gambl*e, 429 U.S. 97, 104 (1976)).  This indifference extends to intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011).

-15-

To prevail on such a claim, Plaintiff must prove "(1) [Morneau] suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir.2004**)**.

Here, it is undisputed that Raborn called for an ambulance within seconds of the shooting. Smith stayed with Morneau and helped him to his side to ease his breathing. Runion went to the trail head so he could lead medical personnel directly to Morneau. There is no evidence of deliberate indifference.

### (M). Supplemental State Law Claims

To the extent the complaint asserts supplemental state law claims, the Court declines to exercise continued jurisdiction over them. 28 U.S.C. § 1367.

### (N). Motion for Facts to be Deemed Admitted

The Miller County Defendants have filed a motion for facts to be deemed admitted. Rule 56.1 of the Local Rules for the Eastern and Western Districts of Arkansas provides that "[a]ll material facts as set forth in the statement [of undisputed material facts] filed by the moving party . . . shall be deemed admitted unless controverted by the statement filed by the non-moving party."

As noted above, Plaintiff did not respond to the summary judgment motions filed by the Defendants. She did not controvert any facts contained in the Defendants statements of undisputed material facts. Therefore, she should be held to have deemed these facts as admitted.

-16-

**4.  Conclusion**

For the reasons stated, I recommend that the Defendants' summary judgment motions (Docs. 76, 81 & 86) be granted and this case dismissed with prejudice.  I further recommend and that Plaintiff's motion for summary judgment (Doc. 93) be denied.   Finally, I recommend that the Miller County Defendants' motion for facts to be deemed admitted be granted.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 10th day of February 2014.

/s/ *J. Marschewski*

 HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)